N.Y.S.D. Case #
09-cv-1251(DAB)

11-3361-cv
*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term 2012

(Argued:  September 28, 2012    Decided:  April 26, 2013)

Docket No. 11-3361-cv

_____

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __April 26, 2013__

RENEE MIHALIK,

*Plaintiff-Appellant,*

v.

CREDIT AGRICOLE CHEUVREUX NORTH AMERICA, INCORPORATED,

*Defendant-Appellee.*

_____

Before:
        CHIN, LOHIER, AND DRONEY, *Circuit Judges*.

_____

Appeal from a judgment of the United States

District Court for the Southern District of New York

(Batts, *J.*), dismissing plaintiff-appellant's claims of

gender discrimination and retaliation under the New York

CERTIFIED COPY ISSUED ON 04/26/2013

City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.*,
after the district court granted defendant-appellee's
motion for summary judgment.  We conclude that, under the
broader standards of the City law, there are genuine
disputes of material fact that require a trial.

   Vacated and Remanded.

---

    Brian Heller, Schwartz & Perry, LLP, New
      York, New York, *for Plaintiff-
      Appellant.*

    Barbara M. Roth (Dori Ann Hanswirth, *on the
      brief*), Hogan Lovells US LLP, New
      York, New York, *for Defendant-
      Appellee.*

---

Chin, *Circuit Judge*:

   In this case, plaintiff-appellant Renee Mihalik
sued her former employer, defendant-appellee Credit
Agricole Cheuvreux North America, Inc. ("Cheuvreux"),
alleging that her supervisor ran the office like a "boys'
club," subjecting her to sexually suggestive comments and
twice propositioning her for sex.  She alleges that when
she refused his sexual advances, he retaliated by berating

- 2 -

her in front of other employees and ultimately firing her.

Mihalik asserted claims of gender discrimination and

retaliation under the New York City Human Rights Law (the

"NYCHRL"), N.Y.C. Admin. Code § 8-107(1)(a), (7).  The

district court granted summary judgment to Cheuvreux,

dismissing the complaint.  We conclude the district court

erred in its application of the NYCHRL.  Because Mihalik

presented sufficient evidence to show there are genuine

disputes of material fact regarding both her claims, we

vacate the district court's judgment and remand for trial.

### STATEMENT OF THE CASE

**A.    *The Facts***

With all conflicts in the evidence resolved and

all reasonable inferences drawn in Mihalik's favor, the

facts may be summarized as follows:

**1.    *Cheuvreux Hires Mihalik***

In July 2007, Cheuvreux hired Mihalik as a Vice

President of Alternative Execution Services, working under

Chief Executive Officer Ian Peacock.  This position

required Mihalik to sell Cheuvreux's electronic equity

trading services to institutional clients and cultivate

them into regular customers.  Cheuvreux hired Mihalik
because she had contacts with several potential clients.
Cheuvreux realized, however, that Mihalik was "coming from
a standing start" and that these relationships were not
"immediately transferable."  Therefore, Cheuvreux did not
set "a hard target" for the revenue she had to generate.

### 2.  *Mihalik's Treatment*

From the moment Mihalik started, Peacock paid
"special attention" to her, asking her about her
relationship status and whether she preferred older men or
was a "cougar."[1]  Immediately, Peacock asked Mihalik to make
sure her travel arrangements for a business trip coincided
with his so they could "enjoy traveling together" and "get
to know each other."  He commented on her appearance often,
telling her she looked "sexy" and that her red shoes meant
she was "promiscuous."  When she wore certain outfits, he
told her that she should "dress like that every day.  You

---

[1]     In this context, as the district court noted, the term
"cougar" refers to "'a middle-aged woman seeking a romantic
relationship with a younger man.'"  *Mihalik v. Credit Agricole
Cheuvreux N. Am., Inc.*, No. 09 Civ. 1251, 2011 WL 3586060, at *2
n.2 (S.D.N.Y. July 29, 2011) (quoting Merriam Webster's Online
Dictionary, http://www.merriam-webster.com/dictionary/cougar
(last visited July 27, 2011)).

might get more clients in turn." About two months after she started, he asked her if she "fanc[ied] dogging" and then, when she did not know what that was, described the sex act to which he was referring. In response, Mihalik would always tell Peacock that his behavior was "inappropriate and unbefitting a CEO."

Peacock's boorish behavior was typical of the "boys['] club" atmosphere in the Cheuvreux office. The male employees regularly talked about visiting strip clubs and rated their female colleagues' appearances. Shortly after one of Mihalik's female co-workers had given birth, Peacock joked that he could not see that co-worker because her "breasts were in the way" and then told her, "[I]f this job doesn't work out, Scores [a New York strip club] is hiring." Upon introducing Mihalik to a new male employee in January 2008, Peacock told her to "respect" the new employee because he was "male" and "more powerful" than she was.[2]

_____

[2] Peacock's recollection of this incident differs substantially, as he recalls that Mihalik raised the subject of gender. According to his contemporaneous notes, Mihalik instigated a fight with the new employee after telling him that his marketing ideas were "crap." Peacock contends that Mihalik

The male employees also frequently looked at pornography on their computers and Peacock showed Mihalik pornography "once or twice a month."[3]  In one instance in August 2007, Mihalik noticed Peacock laughing about something on his computer screen and, when she asked him what was so funny, he showed her an image of a man hanging from his genitals.  He then emailed this image to other employees.  Also that month, another Cheuvreux employee emailed Mihalik a video parody of the television series *CSI*, in which detectives used a black light to search for semen residue on a woman's mouth.[4]

In December 2007, Peacock propositioned Mihalik twice, both times inviting her to spend the night with him

---

stated in this context, "[L]et's face it Ian, you hired me for my looks and that's the only reason people do business. . . .  It is because I have breasts and look good."

[3]    Cheuvreux presented evidence that it blocks employees from accessing pornographic websites on their work computers.

[4]    Cheuvreux alleges that this video originated with Mihalik and that she sent it to both the Cheuvreux employee and a client.  The email Cheuvreux cites, however, clearly indicates that Mihalik received the video from the Cheuvreux employee and she forwarded it only to the client.

- 6 -

at the "Cheuvreux flat."[5]  Mihalik rejected the overtures,
telling Peacock "in no uncertain terms that [she] had no
interest in a personal relationship with him" and that his
conduct was "offensive and shameful."  After these
rejections, Peacock stopped sitting next to Mihalik at the
trading desk -- where he had sat for the first several
months of her employment -- and began treating her
differently.  Among other things, Peacock began to exclude
her from meetings, berate her in front of other employees,
and criticize the quality of her work.

### 3.  *Mihalik Complains*

Mihalik first complained about this behavior
around the end of 2007.  By then, however, the head of
human resources had resigned, leaving Peacock responsible
for most employment matters until a replacement was hired
in March 2008.  Thus, beginning in November 2007, Mihalik
complained about Peacock's inappropriate sexual comments to
David Zack, the head compliance officer, instead of
reporting her concerns to human resources.  Zack's only

---

[5]      Cheuvreux presented evidence that it does not maintain
an apartment or hotel room in New York City.

response was, "[Y]ou can't prove it, he's the CEO, and nobody is going to back you."

In April 2008, Mihalik presented Zack with a draft email she intended to send to Peacock. In the draft email, Mihalik planned to confront Peacock about criticizing her in front of her co-workers, calling his behavior "very unprofessional" and his criticisms "inaccurate," and asking him to calmly discuss these matters with her in private. After reviewing the email, Zack advised Mihalik that she should send it only if she wanted to get fired.

### 4. *Mihalik's Performance Problems*

Mihalik's performance was deficient in certain respects throughout her tenure. First, her monthly sales commissions were substantially below those of her peers. There were, however, mitigating circumstances. Only one of Mihalik's clients was actively trading through the sales desk during her tenure. While Mihalik had successfully signed several institutional clients, those clients had to finish negotiating their contracts with Cheuvreux before they could generate revenue and these negotiations took several months. Some of Mihalik's clients did not begin

generating revenue for Cheuvreux until after her discharge. In contrast, most of her colleagues had established books of clients who regularly conducted business with Cheuvreux.

Second, Mihalik did not follow up on some sales leads in a timely manner. For example, in August 2007, a week after Peacock had provided Mihalik and a colleague with three sales leads, Mihalik emailed the colleague to ask if he knew "anything about these accounts Ian keeps asking us about." At the end of November 2007, she sent a similar email to another colleague, asking about a sales lead that Peacock had originally given her in mid-October. And in January 2008, Mihalik apologized to an overseas colleague for not following up with a client as she had promised, explaining that she was delayed because her airline had lost her luggage containing her business notes.

Finally, Mihalik missed approximately thirty-five days of work during her nine months at Cheuvreux due to vacations, sickness, and personal reasons. Mihalik provided notice and obtained permission for all of her absences, however, and never exceeded her allotted number of vacation and sick days.

### 5. *Mihalik is Discharged*

In April 2008, after she failed to complete an assignment, Cheuvreux discharged Mihalik. Peacock had instructed Mihalik to conduct cold calls for seven days while he was away on business and to have twenty conversations with prospective clients each day. When Mihalik did not complete the assignment, Peacock scheduled a meeting with her. Although initially he had intended only to give her a performance warning, Peacock ultimately fired Mihalik after she asked him, in an allusion to his sexual propositions, "What's not working out[?] Me and you or me at the company?"

## B. *Proceedings Below*

After her discharge, Mihalik filed a complaint against Cheuvreux in the Supreme Court of the State of New York, New York County, alleging gender discrimination and retaliation in violation of the NYCHRL, N.Y.C Admin. Code § 8-107(1)(a), (7). Mihalik did not assert claims under federal or state law. Cheuvreux removed the case to the

Southern District of New York on the basis of diversity of
citizenship of the parties.[6]

After the close of discovery, Cheuvreux moved for
summary judgment.  In a memorandum and order filed July 29,
2011, the district court granted Cheuvreux's motion,
relying on the traditional federal standards for
discrimination and retaliation, and noting that it was
"incorporat[ing] the special considerations" for NYCHRL
claims.  *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
No. 09 Civ. 1251, 2011 WL 3586060, at *1, *5-6 (S.D.N.Y.
July 29, 2011) (citing *Williams v. N.Y.C. Hous. Auth.*, 872
N.Y.S.2d 27 (1st Dep't 2009)).

The district court analyzed Mihalik's gender
discrimination claim using the federal *quid pro quo* and
hostile work environment theories.  *See id.* at *6-8.
Considering her claim under the *quid pro quo* analysis, the
district court concluded that Mihalik failed to show any
connection between Peacock's sexual propositions and any
tangible job detriment, including her discharge.  *See id,*

---

[6]    Mihalik is a citizen of New Jersey and Cheuvreux is a
Delaware corporation with its principal place of business in
either New York or California.

at *6-7.  The district court held that, alternatively,
Mihalik failed to show that the legitimate non-
discriminatory reason articulated by Cheuvreux for her
dismissal -- her poor job performance -- was pretextual.
*See id.* at *8.

Next, the district court performed a hostile work
environment analysis.  *See id.* at *9-10.  Although the
court took note that plaintiffs are not required to satisfy
the federal "severe and pervasive conduct" standard to
prevail on a claim brought under the NYCHRL, *id.* at *9; *see
Williams*, 872 N.Y.S.2d at 37-39, it relied heavily on the
First Department's admonition in *Williams v. New York City
Housing Authority* that the NYCHRL is not a "'general
civility code,'" *Mihalik*, 2011 WL 3586060, at *9 (quoting
*Williams*, 872 N.Y.S.2d at 40-41).  Thus, it held that
Mihalik had merely presented evidence of "'sporadic
insensitive comments,'" rather than an actionable hostile
work environment.  *Id.* at *9-10 (quoting *Fullwood v. Ass'n
for the Help of Retarded Children, Inc.*, 08 Civ. 6739, 2010
WL 3910429, at *9 (S.D.N.Y. Sept. 28, 2010)).

Finally, the district court considered Mihalik's retaliation claims. While recognizing that, under the NYCHRL, protected activities include "'oppos[ing] any practice forbidden under this chapter,'" *id.* at *10 (alteration in original) (quoting N.Y.C. Admin. Code § 8-107(7)), the district court held that Mihalik failed to show a causal connection between her discharge and either her complaints of harassment or her rejection of Peacock's propositions. *Id.* at *10-11. The court held that, alternatively, she had not presented evidence that Cheuvreux's non-discriminatory reasons for her termination were pretextual. *See id.* at *11.

Final judgment dismissing all Mihalik's claims was entered on July 29, 2011. This appeal followed.

### *DISCUSSION*

**A.  *Applicable Law***

**1.  *Standard of Review***

We review *de novo* the district court's grant of summary judgment, construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in her favor. *McElwee v. Cnty. of*

*Orange*, 700 F.3d 635, 640 (2d Cir. 2012).  Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

      2.   ***The NYCHRL***

      For many years, we construed the NYCHRL to be coextensive with its federal and state counterparts.  *See, e.g.*, *Estate of Hamilton v. City of New York*, 627 F.3d 50, 55 (2d Cir. 2010); *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 n.1 (2d Cir. 2009); *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n.1 (2d Cir. 2000).  In 2005, however, the New York City Council amended the NYCHRL by passing the Local Civil Rights Restoration Act of 2005 (the "Restoration Act"), N.Y.C. Local L. No. 85.  *See, e.g.*, *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009); *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 36 (1st Dep't 2009) (Acosta, J.); *see generally* Craig Gurian, *A Return to Eyes on the Prize: Litigating Under the Restored New York City Human Rights Law*, 33 Fordham Urb. L.J. 255 (2006).  As amended, the NYCHRL

requires an independent analysis. *See* Restoration Act § 1; *Loeffler*, 582 F.3d at 278. Nonetheless, district courts continued -- erroneously -- to apply federal standards to NYCHRL claims. *See, e.g.*, *St. Jean v. United Parcel Serv. Gen. Serv. Co.*, No. 12-544-cv, 2013 WL 336006, at *1 (2d Cir. Jan. 30, 2013) (summary order) ("[T]he district court erred to the extent it found that federal standards for recovery are applied in determining employment discrimination claims under the City HRL . . . ."); *Simmons v. Akin Gump Strauss Hauer & Feld, LLP*, No. 11-4480-cv, 2013 WL 261537, at *2 (2d Cir. Jan. 24, 2013) (summary order) ("[T]he district court erred to the extent that it . . . analyzed [the NYCHRL claim] under the same standard as her claims under federal and state law.").

In amending the NYCHRL, the City Council expressed the view that the NYCHRL had been "construed too narrowly" and therefore "underscore[d] that the provisions of New York City's Human Rights Law are to be construed independently from similar or identical provisions of New York state or federal statutes." Restoration Act § 1. To bring about this change in the law, the Act established two

new rules of construction.  First, it created a "one-way
ratchet," by which interpretations of state and federal
civil rights statutes can serve only "'as a *floor* below
which the City's Human Rights law cannot fall.'"  *Loeffler*,
582 F.3d at 278 (quoting Restoration Act § 1).  Second, it
amended the NYCHRL to require that its provisions "be
construed liberally for the accomplishment of the uniquely
broad and remedial purposes thereof, regardless of whether
federal or New York State civil and human rights laws,
including those laws with provisions comparably-worded to
provisions of this title[,] have been so construed."
Restoration Act § 7 (amending N.Y.C. Admin. Code § 8-130).

Pursuant to these revisions, courts must analyze
NYCHRL claims separately and independently from any federal
and state law claims, *see* Restoration Act § 1; *Hernandez v.
Kaisman*, 957 N.Y.S.2d 53, 58 (1st Dep't 2012); Gurian,
*supra*, at 275-77, construing the NYCHRL's provisions
"broadly in favor of discrimination plaintiffs, to the
extent that such a construction is reasonably possible,"
*Albunio v. City of New York*, 16 N.Y.3d 472, 477-78 (2011).
Thus, even if the challenged conduct is not actionable

- 16 -

under federal and state law, federal courts must consider separately whether it is actionable under the broader New York City standards.  *See Hernandez*, 957 N.Y.S.2d at 58 ("While we find that the complained-of incidents do not rise to the level of 'severe and pervasive' for purposes of a claim pursuant to the State HRL, this does not dispose of the question whether plaintiffs' City HRL claim is still viable.").

### a.  *Gender Discrimination*

Section 8-107(1)(a) of the NYCHRL makes it "an unlawful discriminatory practice . . . [f]or an employer or an employee or agent thereof, because of the . . . gender . . . of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."  N.Y.C. Admin. Code § 8-107(1)(a).  Applying the Restoration Act's new rules of construction, the First Department has established a new standard of liability for gender discrimination under the NYCHRL.

Construing the phrase "discriminate against . . . in terms, conditions or privileges of employment" broadly, the First Department reasoned that forcing a targeted employee to suffer "unwanted gender-based conduct" imposes a different term or condition of employment on her, even if the harassing conduct does not rise to the level of being "severe and pervasive." *Williams*, 872 N.Y.S.2d at 38. Therefore, the First Department declined to use the federal "severe and pervasive" standard for NYCHRL claims and instead adopted "a rule by which liability is normally determined simply by the existence of differential treatment." *Id.* To establish a gender discrimination claim under the NYCHRL, the plaintiff need only demonstrate "by a preponderance of the evidence that she has been treated less well than other employees because of her gender." *Id.* at 39; *accord Nelson v. HSBC Bank USA*, 929 N.Y.S.2d 259, 264 (2d Dep't 2011) (adopting the same standard of liability).

Under this standard, the conduct's severity and pervasiveness are relevant only to the issue of damages. *See Williams*, 872 N.Y.S.2d at 38. To prevail on liability,

the plaintiff need only show differential treatment -- that she is treated "less well" -- because of a discriminatory intent.[7] *See id.* at 39.  Indeed, the challenged conduct need not even be "'tangible' (like hiring or firing)."  *Id.* at 40.

When applying this standard, however, district courts must be mindful that the NYCHRL is not a "general civility code."  *Id.* at 40-41 (internal quotation marks and citation omitted).  The plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive.  It is not enough that a plaintiff has an overbearing or obnoxious boss.  She must show that she has been treated less well at least in part "*because of* her gender."  *Id.* at 39, 40 n.27 (emphasis added).[8]

---

[7]     We note that our discussion applies only to disparate treatment claims and that a separate provision of the NYCHRL applies to disparate impact claims.  *See* N.Y.C. Admin. Code § 8-107(17); *Levin v. Yeshiva Univ.*, 96 N.Y.2d 484, 491 (2001); *cf. Ricci v. DeStefano*, 557 U.S. 557, 577-78 (2009) (explaining that, under Title VII, liability for disparate treatment requires intentional discrimination, but liability for disparate impact does not).

[8]     It is unclear whether, and to what extent, the *McDonnell Douglas* burden-shifting analysis has been modified for NYCHRL claims.  *Compare Bennett v. Health Mgmt. Sys., Inc.*, 936 N.Y.S.2d 112, 116 (1st Dep't 2011) (beginning to consider how

- 19 -

Even if the plaintiff establishes that she was
treated "less well" because of her gender, defendants may
assert "an affirmative defense whereby [they] can still
avoid liability if they prove that the conduct complained
of consists of nothing more than what a reasonable victim

---

*McDonnell Douglas* framework should be modified), *with Melman v.
Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 30 (1st Dep't 2012)
("[N]either the [Restoration Act] nor the City Council report
thereon . . . indicates that the *McDonnell Douglas* framework is
to be discarded."). Although *Bennett* seemed to suggest the
analysis has changed, the First Department later narrowly
construed *Bennett* as only requiring trial courts to consider
whether plaintiff's claim could survive under either the
*McDonnell Douglas* analysis or a mixed motives theory of
liability. *See Melman*, 946 N.Y.S.2d at 30. It is unclear how
this differs from the federal standard. *See, e.g.*, *Garcia v.
Hartford Police Dep't*, 706 F.3d 120, 127 (2d Cir. 2013) ("[T]o
defeat summary judgment . . . the plaintiff is not required to
show that the employer's proffered reasons were false or played
no role in the employment decision, but only that they were not
the only reasons and that the prohibited factor was at least one
of the motivating factors." (internal quotation marks and
citation omitted)).

It is not necessary to resolve this issue. While it
is unclear whether *McDonnell Douglas* continues to apply to
NYCHRL claims and, if so, to what extent it applies, the
question is also less important because the NYCHRL simplified
the discrimination inquiry: the plaintiff need only show that
her employer treated her less well, at least in part for a
discriminatory reason. The employer may present evidence of its
legitimate, non-discriminatory motives to show the conduct was
not caused by discrimination, but it is entitled to summary
judgment on this basis only if the record establishes as a
matter of law that "discrimination play[ed] *no* role" in its
actions. *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 38,
40 n.27 (1st Dep't 2009); *see also Furfero v. St. John's Univ.*,
941 N.Y.S.2d 639, 642 (2d Dep't 2012) (citing *Bennett*, 936
N.Y.S.2d at 124).

of discrimination would consider 'petty slights and trivial
inconveniences.'" *Id.* at 41 (quoting *Oncale v. Sundowner
Offshore Servs.*, 523 U.S. 75, 81 (1998)). As with most
affirmative defenses, the employer has the burden of
proving the conduct's triviality under the NYCHRL. *See
Drexel Burnham Lambert Grp. Inc. v. Galadari*, 777 F.2d 877,
880 (2d Cir. 1985) (citing *Blunt v. Barrett*, 124 N.Y. 117,
119 (1891)) ("The party asserting an affirmative defense
usually has the burden of proving it."). The employer may
prevail on summary judgment if it shows that a reasonable
jury could conclude only that the conduct amounted to no
more than a petty slight. *Williams*, 872 N.Y.S.2d at 41.
Thus, courts may still dismiss "truly insubstantial cases,"
where the defense is clear as a matter of law. *Id.*

In evaluating both the plaintiff's claim and the
defendant's affirmative defense, courts must consider the
"totality of the circumstances." *Hernandez*, 957 N.Y.S.2d
at 59. "[T]he overall context in which [the challenged
conduct occurs] cannot be ignored." *Id.* Even "a single
comment that objectifies women . . . made in circumstances
where that comment would, for example, signal views about

- 21 -

the role of women in the workplace [may] be actionable."
*Williams*, 872 N.Y.S.2d at 41 n.30.

Although the First Department has observed that a
jury is often best suited to make this determination, *id.*
at 41, we note that summary judgment still can be an
appropriate mechanism for resolving NYCHRL claims. Even in
this context, summary judgment remains "an integral part of
the Federal Rules [of Civil Procedure] as a whole, which
are designed 'to secure the just, speedy and inexpensive
determination of every action.'" *Celotex Corp. v. Catrett*,
477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). The
Restoration Act cannot, as a procedural matter, limit our
interpretation of Rule 56. *See Com/Tech Commc'n Techs.,
Inc. v. Wireless Data Sys., Inc.*, 163 F.3d 149, 150-51 (2d
Cir. 1998) (per curiam) ("[W]here the matter in question is
one covered by the Federal Rules of Civil Procedure, 'it is
settled that . . . the Federal Rule applies regardless of
contrary state law.'" (omission in original) (quoting
*Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427
n.7 (1996))). While the New York City Council may provide
a different substantive standard to be applied to

particular claims in federal court, the same federal procedural rules apply. *See, e.g.*, *id.* at 150 ("Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." (internal quotation marks omitted)). Furthermore, even New York courts continue to grant and affirm the granting of summary judgment dismissing NYCHRL claims. *See, e.g.*, *Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 44 (1st Dep't 2012) ("[E]ven after the passage of the [Restoration Act], not every plaintiff asserting a discrimination claim will be entitled to reach a jury . . . ."); *Bennett*, 936 N.Y.S.2d at 123-25 (affirming grant of summary judgment); *Williams*, 872 N.Y.S.2d at 42 (same). Accordingly, district courts may still grant summary judgment with respect to NYCHRL claims if there is no genuine dispute as to any material fact regarding plaintiff's claim and the employer's affirmative defense. *See* Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 324.

### b. *Retaliation*

Section 8-107(7) of the NYCHRL prohibits employers from "retaliat[ing] or discriminat[ing] in any manner

against any person because such person has . . . opposed

any practice forbidden under this chapter." N.Y.C. Admin.

Code § 8-107(7). The Restoration Act amended this section

to further provide:

> The retaliation or discrimination
> complained of under this subdivision
> need not result in an ultimate
> action with respect to employment,
> . . . or in a materially adverse
> change in the terms and conditions
> of employment, . . . provided,
> however, that the retaliatory or
> discriminatory act or acts
> complained of must be reasonably
> likely to deter a person from
> engaging in protected activity.

Restoration Act § 3 (amending N.Y.C. Admin. Code

§ 8-107(7)). Thus, to prevail on a retaliation claim under

the NYCHRL, the plaintiff must show that she took an action

opposing her employer's discrimination, *see Albunio*, 16

N.Y.3d at 479, and that, as a result, the employer engaged

in conduct that was reasonably likely to deter a person

from engaging in such action, *see Williams*, 872 N.Y.S.2d at

33-34.

In accordance with the Restoration Act's rules of

construction, New York courts have broadly interpreted the

NYCHRL's retaliation provisions. *See, e.g.*, *Albunio*, 16 N.Y.3d at 477-78. The New York Court of Appeals has held that "oppos[ing] any practice" can include situations where a person, before the retaliatory conduct occurred, merely "made clear her disapproval of [the defendant's] discrimination by communicating to [him], in substance, that she thought [his] treatment of [the victim] was wrong." *Id.* at 479.

Similarly, the First Department has held that "no challenged conduct may be deemed nonretaliatory" unless "a jury could not reasonably conclude from the evidence that such conduct was . . . 'reasonably likely to deter a person from engaging in protected activity.'" *Williams*, 872 N.Y.S.2d at 34. This "assessment [should] be made with a keen sense of workplace realities, of the fact that the 'chilling effect' of particular conduct is context-dependent, and of the fact that a jury is generally best suited to evaluate the impact of retaliatory conduct." *Id.*

### 3. *Analysis of NYCHRL Claims*

To summarize, federal courts reviewing NYCHRL claims are to be guided by the following considerations:

(1) NYCHRL claims must be analyzed separately and independently from federal and state discrimination claims, *see* Restoration Act § 1; *Hernandez*, 957 N.Y.S.2d at 58;

(2) the totality of the circumstances must be considered because "the overall context in which [the challenged conduct occurs] cannot be ignored," *Hernandez*, 957 N.Y.S.2d at 59;

(3) the federal severe or pervasive standard of liability no longer applies to NYCHRL claims, and the severity or pervasiveness of conduct is relevant only to the scope of damages, *see Williams*, 872 N.Y.S.2d at 38;

(4) the NYCHRL is not a general civility code, *see Williams*, 872 N.Y.S.2d at 40, and a defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by discriminatory or retaliatory motives, *see id.* at 39-40 & n.27, or if the defendant proves the conduct was nothing more

than "petty slights or trivial
inconveniences," *id.* at 41;

(5) while courts may still dismiss "truly
insubstantial cases," even a single comment
may be actionable in the proper context, *id.*
at 41 & n.30; and

(6) summary judgment is still appropriate in
NYCHRL cases, but only if the record
establishes as a matter of law that a
reasonable jury could not find the employer
liable under any theory, *see Melman*, 946
N.Y.S.2d at 30; *Furfero v. St. John's Univ.*,
941 N.Y.S.2d 639, 642 (2d Dep't 2012).

**B.  *Application***

We consider in turn Mihalik's claims of gender
discrimination and retaliation.

**1.  *Gender Discrimination***

Applying the standards set out above, we conclude
that the district court erred in granting summary judgment
dismissing Mihalik's gender discrimination claim because
there is a genuine dispute as to whether she was treated

- 27 -

less well than her male colleagues because of her gender.
Mihalik presented evidence that men in the Cheuvreux office
"objectified" women by openly viewing and sharing
pornography, discussing their jaunts to strip clubs, rating
the female employees' appearances, and making lascivious
comments about women's outfits and bodies. *See Hernandez*,
957 N.Y.S.2d at 59 ("[C]omments and emails objectifying
women's bodies and exposing them to sexual ridicule, even
if considered 'isolated,' clearly signaled that defendant
considered it appropriate to foster an office environment
that degraded women."). There was even evidence that
Peacock explicitly told Mihalik that male employees should
be respected because they were "male" and thus "more
powerful" than women. *See Williams*, 872 N.Y.S.2d at 41
n.30 ("[A] single comment that objectifies women . . .
made in circumstances where that comment would, for
example, signal views about the role of women in the
workplace [may] be actionable.").

Mihalik was subjected to this environment, and
also had to suffer Peacock's unwanted sexual attention,
including two sexual propositions. If a jury were to

credit Mihalik's testimony, it could reasonably find that she was treated "less well" than her male colleagues because of her gender, and that the conduct complained of was neither petty nor trivial. *Id.* at 39, 41; *see also Hernandez*, 957 N.Y.S.2d at 57 ("'The mere fact that men and women are both exposed to the same offensive circumstances on the job site . . . does not mean that, as a matter of law, their work conditions are equally harsh.'" (quoting *Petrosino v. Bell Atl.*, 385 F.3d 210, 221 (2d Cir. 2004))).

The district court reached a different conclusion by relying on reasons that find no support in the NYCHRL, as interpreted by New York courts. First, the district court analyzed Mihalik's gender discrimination claim under two federal standards of liability: the *quid pro quo* analysis -- looking for a connection between the discriminatory conduct and a materially adverse employment action -- and a hostile work environment analysis -- looking for conduct severe or pervasive enough to alter the terms of Mihalik's employment. *Mihalik*, 2011 WL 3586060, at *6-10. *Williams* made clear, however, that the NYCHRL does not require either materially adverse employment

actions or severe and pervasive conduct.  *See Williams*, 872
N.Y.S.2d at 34, 37-39.  Instead, "a focus on unequal
treatment based on gender -- regardless of whether the
conduct is 'tangible' (like hiring or firing) or not -- is
in fact the approach that is most faithful to the uniquely
broad and remedial purposes of the local statute."  *Id.* at
40.  Thus, Peacock's alleged mistreatment of Mihalik would
be actionable under the NYCHRL even if it was unrelated to
her discharge[9] and was neither severe nor pervasive.  *Id.* at
39.

       Second, the district court concluded that Mihalik
had not shown that Cheuvreux's proffered reason for her
dismissal -- her poor performance -- was a pretext for
discrimination.  Under the NYCHRL, however, differential
treatment may be actionable even if it does not result in
an employee's discharge.  *See id.* at 40.  Even a poorly-
performing employee is entitled to an environment free from
sexual harassment.  *See id.* at 38 ("[A]nalysis of the City
HRL must be guided by the need to make sure that

---

       [9]    For reasons discussed more fully in the next section,
there is also a genuine dispute as to Cheuvreux's motivation for
Mihalik's discharge.

discrimination plays *no* role [in the workplace] . . . ."). Therefore, Mihalik's alleged poor performance would not excuse Peacock's alleged sexual advances and demeaning behavior. In other words, even assuming that Mihalik could not prove she was dismissed for a discriminatory reason or that Cheuvreux had good grounds for discharging her, Mihalik could still recover for any other differential treatment based on her gender.[10]

Finally, the district court concluded that Mihalik's testimony showed no more than "'sporadic insensitive comments'" and it granted summary judgment because the NYCHRL was not a "general civility code." *Mihalik*, 2011 WL 3586060, at *9-10 (quoting *Fullwood*, 2010 WL 3910429, at *9). This analysis places too much emphasis on *Williams*'s recognition that the NYCHRL should not "operate as a 'general civility code,'" and too little emphasis on its exhortation that even "a single comment" may be actionable in appropriate circumstances. *See Williams*, 872 N.Y.S.2d at 40-41 & n.30 (quoting *Oncale*, 523

---

[10] Of course, whether Mihalik's discharge resulted from discriminatory treatment against her would be relevant to the quantum of damages.

U.S. at 81).  Under New York law, a defendant is entitled
to summary judgment based on the conduct's triviality only
if a reasonable jury could not interpret the alleged
comments as anything "more than petty slights or trivial
inconveniences."  *Id.* at 41.  Construing the evidence in
its totality and in Mihalik's favor, we conclude that a
jury could reasonably find that Peacock's behavior
constituted more than "petty slights or trivial
inconveniences," and that it was sexually-charged conduct
that subjected Mihalik to a different set of employment
conditions than her male colleagues.[11]  Accordingly, the
grant of summary judgment dismissing Mihalik's gender
discrimination claim was inappropriate.

---

[11]    While there is evidence that Mihalik engaged in
similar boorish behavior, such as sending an email to a male
employee that read "hey . . . Stud" or telling another that he
"looked so ripped," it is the province of the jury to weigh this
competing evidence and decide whether it indicates that Mihalik
worked under the same terms and conditions of employment as her
male co-workers or that the challenged conduct was too trivial
to be a basis for liability.  Viewing Mihalik's comments in
context, a jury may conclude that they were made in jest, were
less offensive than those allegedly made by the male employees,
or were her attempt to cope with her hostile work environment.
Therefore, we cannot conclude that this evidence shows Cheuvreux
is entitled to judgment as a matter of law.

## 2. *Retaliation*

Applying the New York courts' interpretation of the NYCHRL's retaliation provision, we conclude there is a genuine dispute as to whether Peacock retaliated against Mihalik for opposing his discriminatory conduct. First, there is an issue of fact regarding what occurred in the April 2008 meeting at which Mihalik was fired. It is undisputed that Peacock had no intention of firing Mihalik before that meeting, but the parties do dispute what happened during the meeting. Mihalik testified that Peacock fired her only after she asked, "What's not working out[?] Me and you or me at the company?" Under the NYCHRL, by implicitly referencing her rejection of his sexual propositions, she may have opposed his discrimination by "communicating to [Peacock], in substance, that she thought [Peacock's] treatment of [her] was wrong." *Albunio*, 16 N.Y.3d at 479. If the jury credits this testimony and finds that Peacock fired Mihalik because she denounced his sexual propositions in the April 2008 meeting, Peacock would be liable for retaliation under the NYCHRL. Thus, the district court erred in concluding

that "disputes about details of this meeting are not relevant." *Mihalik*, 2011 WL 3586060, at *3 n.4.

Second, putting aside what happened at the April 2008 meeting, there is a genuine dispute as to whether Peacock retaliated against Mihalik in other ways. A jury could reasonably find that Mihalik had also opposed Peacock's discriminatory conduct by rejecting his advances in December 2007 and telling him that his actions were "offensive and shameful." *Cf. Albunio*, 16 N.Y.3d at 479 (affirming jury's finding that an employee "'opposed' discrimination" by telling her supervisor, after he criticized her for recommending a homosexual candidate for a job, that she would do it again and making clear her disapproval of her supervisor's discriminatory action).[12] Mihalik testified in her deposition that, after she

_____

[12] We offer no opinion on whether merely rejecting a sexual advance is cognizable under the federal or state counterparts to the NYCHRL. *Compare LeMaire v. Louisiana Dep't of Transp. & Dev.*, 480 F.3d 383, 389-90 (5th Cir. 2007) ("rejecting sexual advances" in and of itself is not a protected activity under Title VII), *with Ogden v. Wax Works*, 214 F.3d 999, 1007 (8th Cir. 2000) (rejecting advance and telling supervisor to stop his offensive conduct constituted "the most basic form of protected conduct"). As we caution above, the NYCHRL calls for an independent analysis that is consistent with its "uniquely broad and remedial purposes." Restoration Act § 7.

rejected Peacock's propositions in this manner, he began to

tell her -- in front of her mostly male colleagues -- that

she "add[ed] nothing of value," that she has "no fucking

clue what [she was] doing," and that she was "pretty much

useless."  Mihalik also alleges that Peacock stopped

sitting next to her at the trading desk and instructed the

staff to exclude her from meetings.

The jury could find that Peacock's actions were

the result of Mihalik's opposition in December 2007.  While

Cheuvreux presented evidence of flaws in Mihalik's

performance throughout her employment, the company

presented no evidence that anyone confronted her about

these problems before she rejected Peacock's alleged

advances in December 2007.  Indeed, Mihalik alleges that

the meeting in April 2008 was the first time Peacock met

with her to review her performance.  Again, Peacock had no

intention of firing Mihalik before the meeting.  Drawing

all reasonable inferences in Mihalik's favor, we cannot

conclude as a matter of law that there was no causal

connection between the rejections and Peacock's subsequent

demeaning conduct.[13]  Moreover, keeping in mind "workplace
realities" and "the fact that the 'chilling effect' of
particular conduct is context-dependent," a jury could
reasonably find that publicly humiliating Mihalik in front
of her male counterparts and otherwise shunning her was
likely to deter a reasonable person from opposing his
harassing behavior in the future.  *See Williams*, 872
N.Y.S.2d at 34; *see also Albunio*, 16 N.Y.3d at 476, 478
(finding no merit in defendant's argument that certain
employment actions, including being "shunned and excluded
from meetings," were not adverse as a matter of law);
Gurian, *supra*, at 322 (asserting that if "the cost of
opposing discrimination would be the loss of all future
social intercourse with other employees, the workplace
reality would be that some people -- indeed, many people --
would become less likely to oppose discrimination than they
otherwise would be").

---

[13]    For similar reasons, a jury could also find that Peacock's
behavior and Mihalik's discharge were additional instances in
which she was treated less well because of her gender.  Instead
of viewing Mihalik's rejections as opposing discrimination, a
jury may view them as failing to submit to Cheuvreux's
discriminatory term or condition of employment -- i.e.,
accepting the CEO's sexual advances -- which Peacock sought to
enforce by humiliating and firing her.

The district court also granted summary judgment
on the alternative ground that Mihalik had not shown that
Cheuvreux's non-discriminatory justification for Mihalik's
discharge was pretextual.  We conclude this was error.  As
an initial matter, summary judgment is appropriate only if
the plaintiff cannot show that retaliation played any part
in the employer's decision.  *See Melman*, 946 N.Y.S.2d at
30-31; *Furfero*, 941 N.Y.S.2d at 642.  At the least, the
dispute surrounding the April 2008 meeting raises a
question of fact as to whether Cheuvreux had mixed motives
for firing Mihalik.  Because the undisputed evidence
demonstrates that her performance did not motivate Peacock
to fire her before the April 2008 meeting, a jury could
credit Mihalik's version of that meeting and find that
retaliation was a motivating factor for her discharge.

In addition, we conclude that Mihalik has
presented sufficient evidence from which a jury could
conclude Cheuvreux's non-discriminatory rationale was
pretextual.  In response to Cheuvreux's evidence of her low
sales commissions and failure to follow up on some sales
leads, Mihalik presented evidence that:  Cheuvreux hired

- 37 -

her because she had pre-existing contacts with prospective clients; Mihalik in fact signed many of those clients; Cheuvreux set no hard sales targets for Mihalik because she was beginning from a "standing start"; Cheuvreux knew it could take many months for a new client to start generating revenue; and some of the clients Mihalik signed began producing revenue for Cheuvreux only after her dismissal. Mihalik also presented evidence showing that she did not exceed her allotted number of vacation and sick days, and that Peacock had approved each of her vacation requests. From this evidence, a jury could find that Mihalik's true value rested on her ability to recruit large institutional clients and Cheuvreux knew that several of them would begin to generate income shortly.

More importantly, while we agree that the evidence of Mihalik's poor performance was substantial, we also conclude that a jury could find, notwithstanding that poor performance, that Cheuvreux was not yet ready to fire Mihalik and that it did so only after Peacock became angry that Mihalik raised the issue of his sexual advances. Moreover, because Peacock had never criticized Mihalik's

performance before she rejected his propositions, a jury could find that he used her shortcomings as an excuse to humiliate and punish her for opposing his discriminatory behavior.  If a jury so found, it would be free to infer that Cheuvreux is using Mihalik's poor performance now as a mere cover-up for retaliation.  *See Bennett*, 936 N.Y.S.2d at 124.  Therefore, the district court erred in granting summary judgment on Mihalik's retaliation claim.

### *CONCLUSION*

We conclude that the district court erred in granting summary judgment because the record below presented genuine disputes of material fact regarding both Mihalik's claims under the NYCHRL.  Accordingly, the judgment is VACATED and the case is REMANDED for trial.

**A True Copy**
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

- 39 -